# IN THE COURT OF APPEALS OF IOWA

No. 17-0287
Filed May 17, 2017

**IN THE INTEREST OF L.M.,**
**Minor Child,**

**K.L., Mother,**
        Appellant.
_____

        Appeal from the Iowa District Court for Page County, Amy Zacharias, District Associate Judge.


        An incarcerated mother appeals the termination of her parental rights to her one-year-old daughter. **REVERSED AND REMANDED FOR FURTHER PROCEEEDINGS.**


        Justin R. Wyatt of Woods & Wyatt, P.L.L.C., Glenwood, for appellant mother.

        Thomas J. Miller, Attorney General, and Tabitha J. Gardner, Assistant Attorney General, for appellee State.

        Sarah M. Hart of Reisinger Booth and Associates, P.C. L.L.O., Omaha, Nebraska, guardian ad litem for minor child.


        Considered by Vaitheswaran, P.J., and Tabor and Mullins, JJ.

**TABOR, Judge.**

A mother, Katherine, appeals a juvenile court order terminating her parental rights to her one-year-old daughter, L.M. Katherine alleges that after removing L.M. from her care, the Iowa Department of Human Services (DHS) failed to make reasonable efforts to provide reunification services by not offering any visitation opportunities following her incarceration at the Iowa Correctional Institution for Women (ICIW) in Mitchellville. Katherine—who testified she had been granted parole—asks us to reverse the termination order and delay permanency for six months to afford her the chance to engage in meaningful contact with her daughter.[1]

## I. Standard of Review

We review child-welfare appeals de novo, which means we examine both the facts and law and adjudicate anew those issues properly preserved and presented. *See In re L.G.*, 532 N.W.2d 478, 480 (Iowa Ct. App. 1995).

## II. Facts and Prior Proceedings

At her birth in late December 2015, L.M. tested positive for amphetamines, methamphetamine, and benzodiazepine. Before the newborn left the hospital, she was removed from the care of her mother, Katherine. Katherine had only attended one prenatal appointment and admitted using methamphetamine up to

---

[1] Katherine also challenges the statutory grounds for termination under Iowa Code section 232.116(1) (2016), and the court's best-interests finding under section 232.116(2). Because we believe it is appropriate to delay permanency under section 232.104(2)(b), we do not reach her other claims.

the day before she gave birth to L.M.[2]  The DHS placed L.M. in foster care and she has remained with the same family throughout the course of this case.

The DHS first offered Katherine visitation with L.M. on January 5, 2016, at the residence of Katherine's mother.  According to the DHS report, "Katherine appeared to be loving toward [L.M.] during the interaction, but seemed unsure of herself.  She had diapers and some outfits for [L.M.].  Katherine asked about the type of formula [L.M.] was using."  Katherine's boyfriend[3] called to say he and Katherine had overslept for a second visit scheduled for January 6.  The DHS worker required Katherine to confirm future visits two hours in advance, which she failed to do for a visit scheduled for January 8.

On January 10, 2016, Katherine was arrested for conspiracy to deliver methamphetamine and held in the Fremont County jail.  On February 4, the juvenile court held a hearing on the State's petition to adjudicate L.M. as a child in need of assistance (CINA).  At that hearing, Katherine's attorney asked for the DHS to facilitate visitation: "If there is any possible way we can have any visitation between mom and child, given the setting, I would like to ask for that.  But typically with the jail setting, it's usually impossible.  But I would like DHS to look at it."

In response to this request, the hearing transcript reflects the following exchange between the court and DHS case worker Christy Nook:

> THE COURT: Ms. Nook, you are making a face over there.

---

[2] Katherine's drug addiction previously resulted in her losing her parental rights to two older children.

[3] Although the boyfriend was initially given visitation with L.M., paternity testing eventually revealed he was not her father.  At the time of the termination hearing, L.M.'s biological father was unknown.

CPW NOOK: I don't know what—with her being in jail, it's not like she would have face-to-face with that baby. It's—I don't know with the new jail if it's a screen TV—it's a TV screen.

THE COURT: I would say that the Court does not find that probably visitation in that setting is appropriate.

The court adjudicated L.M. as a CINA on February 5, 2016. In that order, the court stated: "The parties shall be allowed visitation as arranged and approved by the DHS."

At a February 18, 2016 disposition hearing, the court ordered visitation to remain at the discretion of the DHS and the guardian ad litem. Meanwhile, Katherine pleaded guilty to drug charges that resulted in a prison sentence not to exceed ten years. She was transferred to Mitchellville on February 26, 2016. The DHS never offered Katherine visitation with L.M. at the ICIW. The DHS reports filed as exhibits in the termination hearing declare: "mother has not been offered visitations due to being incarcerated." The only contact facilitated between mother and daughter was the family safety, risk, and permanency (FSRP) provider sending a monthly photograph of L.M. to Katherine in prison. Despite no indication the DHS considered offering Katherine visitation in prison, the juvenile court found in a June 2, 2016 order that the DHS had made reasonable efforts to reunify L.M. with her mother.

In early September 2016, Katherine sent a letter to her FSRP provider updating the court on her progress and requesting visitation when she was released to a residential correctional facility (RCF) in Council Bluffs. Katherine wrote: "During the duration of my stay here in ICIW I will be able to meet all the goals set forth in the case plan that's in place with DHS." Katherine's

handwritten letter contained sound insights into the circumstances that led to L.M.'s removal:

> I understand that my poor choices are what led up to my incarceration and my involvement with DHS. I am the only one to blame and I hold myself completely accountable for my actions and decisions. It most certainly isn't fair to my daughter to be absent from her life for any amount of time. My daughter deserves a mother that is sober, healthy, stable, responsible, and present. . . . I am making personal changes and lifestyle changes in order to be the parent she needs and deserves.

The court again stated in its September 15 order that visitation would be allowed "as arranged and approved by DHS."

The State filed a petition to terminate parental rights on October 20, 2016. On January 19, 2017, the juvenile court held a permanency review and termination hearing. At that hearing, Katherine's attorney appealed to the court for additional time to work for reunification:

> It's my understanding that my client may be eligible for release to a halfway house or something in the near future, and I would just make a request on the record that we would be given extra time to continue out the termination so that my client can participate in services.

The juvenile court rejected that request and proceeded to the evidence on termination of parental rights.

The State offered reports filed by the DHS and FSRP workers but called no witnesses at the hearing. Katherine, who testified telephonically from prison, was the only witness. She testified she had successfully completed a six-month drug-treatment program in prison. She explained learning strategies for staying clean that she had not previously mastered. She also told the court she had been allowed to live in less-restrictive housing outside the prison walls because

she was considered a "model inmate." She travelled from Mitchellville to Des Moines daily to work at the Department of Corrections (DOC) central office, where she had learned computer and other job skills. She testified she expected that those skills would enable her to be "a productive member of society rather than the life [she] was living." Katherine also completed DOC programming aimed at preparing offenders for reentry into their communities.

Katherine told the court she had been recently granted parole and was awaiting a bed at the RCF in Council Bluffs, where she would participate in a three-month transitional program. Katherine expressed her plans to participate in parenting classes, as well as sobriety programs such as AA and NA, when she returned to the community. Neither the county attorney nor the guardian ad litem cross-examined Katherine.

On January 27, 2017, the juvenile court issued its order terminating Katherine's parental rights. The court relied on paragraphs (b), (e), and (h) of section 232.116(1).[4] Katherine now appeals.

### III. Analysis

On appeal, Katherine requests an additional six months to reunify with her daughter. She asserts "she was not given the opportunity to have any significant or meaningful contact with the child" during the CINA case. She contends "it is reasonable to delay permanency for a period of several more months to afford

---

[4] Under subsection (b), the court found clear and convincing evidence of abandonment. Under subsection (e), the court found L.M. had been adjudicated CINA, had been out of the mother's care for at least six months, and the mother had not maintained significant and meaningful contact with L.M. and had made no reasonable efforts to resume care in spite of being given the opportunity to do so. Under subsection (h), the court found L.M. was three years of age or younger, was adjudicated CINA, had been removed from the mother's care for at least six months of the last twelve months, and could not be returned home at the present time.

her the opportunity to be released from prison, complete the RCF program, and assume care of L.M."

The State argues the juvenile court correctly rejected Katherine's proposal to delay permanency given the mother's history of drug use and incarceration.

After reviewing the record de novo, we conclude continuation of L.M.'s placement for an additional six months is appropriate, given Katherine's uncontested testimony at the termination hearing concerning her remarkable progress while incarcerated. Katherine's commitment to drug treatment, her exemplary compliance with prison regulations, and her development of employment skills all signal the behavioral changes necessary to offer a stable home for a child. *See* Iowa Code § 232.104(2)(b) (requiring enumeration of "specific factors, conditions, or expected behavioral changes which comprise the basis for the determination that the need for removal of the child from the child's home will no longer exist at the end of the additional six-month period").

We recognize Katherine has had only one interaction with L.M. and would need time to develop a relationship with her daughter and demonstrate effective parenting skills. We also recognize the challenge in offering visitation stemmed from Katherine's incarceration following her criminal conduct. But we have repeatedly expressed that a parent's incarceration does not absolve the DHS of its duty to provide reunification services, including visitation if reasonable. *See In re S.J.*, 620 N.W.2d 522, 525 (Iowa Ct. App. 2000); *see also In re J.H.*, No. 17-0205, 2017 WL 1400927, at *2 (Iowa Ct. App. Apr. 19, 2017); *In re R.C.*, No. 16-1131, 2016 WL 4803919, at *1 (Iowa Ct. App. Sept. 14, 2016); *In re K.M.*, No. 16-0795, 2016 WL 4379375, at *5 (Iowa Ct. App. Aug. 17, 2016); *In re K.L.P.*,

No. 15-1371, 2015 WL 6507840, at *4–5 (Iowa Ct. App. Oct. 28, 2015); *In re T.A.*, No. 03-0452, 2003 WL 21459553, at *2 (Iowa Ct. App. June 25, 2003); *cf. In re M.M.S.*, 502 N.W.2d 4, 8 (Iowa 1993) (clarifying in chapter 600A case that termination of parental rights is not "a necessary result of conviction of a crime and resulting imprisonment").

Here, the DHS failed to follow the mandate from *In re S.J.* to make a record concerning the reasonableness of facilitating visitation or other contact between L.M. and her mother while the mother was incarcerated. In its response to Katherine's petition on appeal, the State contends "the issue of prison visitation was considered by the juvenile court in February of 2016 at the adjudicatory hearing." That contention is inaccurate—the issue of *prison* visitation was not broached because Katherine had not yet been transferred to the ICIW. Rather, the juvenile court summarily rejected a request for visitation at the Fremont County *jail*, relying on assumptions by the DHS worker, who was obviously predisposed against the idea, that only video visitation was available at the jail. It appears the State did nothing to actually investigate the jail's policies or to follow up on the mother's request in any other manner.

The State further argues on appeal that once Katherine was sentenced to prison in Mitchellville—two and one-half hours away from L.M's foster home in Page County—"it was wintertime" and "[t]here is no record any party recommended attempting five-hour drives with a two-month-old baby in February so visitation could be provided at the prison." The State also asserts, without citation to the record, that "[i]t is worth noting that DHS is not granted input into the prison's policies associated with visitation for prisoners and newborn babies."

The State further faults Katherine for not "providing any basis for how relevant visitation with a baby could have occurred give the circumstances and restrictions of the Mitchellville prison system."

The State's arguments defending the DHS efforts to comply with its reasonable-efforts requirement in this case ring hollow. L.M. obviously grew beyond the newborn stage and presumably the risk of winter-driving weather dissipated in March, April, May, June, July, August, and September—while Katherine was confined at the ICIW but offered no visitation by the DHS. The State attempts to shift the burden to the mother to show how DHS could have navigated the prison restrictions on visitation, but the State offered no evidence that DOC policies prohibited the DHS from providing Katherine any opportunity to spend time with L.M.

The DHS reports include the barebones statement: "mother has not been offered visitations due to being incarcerated." Those reports do not show the DHS case workers gave any thought to factors relevant to assess whether visitation would have been reasonable in this case. *See S.J.*, 620 N.W.2d at 525 (suggesting DHS consider the child's age, any parent-child bond, any clinical or other recommendations concerning visitation, nature of parenting deficiencies, physical location of child and parent, limitations of the place of confinement, services available in the prison setting, nature of the offense, and length of the parent's sentence). Accordingly, we agree with Katherine's contention the DHS failed to satisfy the reasonable-efforts mandate. *See In re C.B.*, 611 N.W.2d 489, 493 (Iowa 2000) (explaining State must show reasonable efforts as a part of its ultimate proof the child cannot be safely returned to care of parent); *see also*

Iowa Code § 232.102(12) (allowing court to waive reasonable efforts requirement under certain circumstances only with written findings of fact based on evidence in record).

Katherine has taken positive steps to improve her prospects of becoming a good parent. At the same time, the DHS failed to meet its mandate to offer reunification services, specifically visitation with L.M., without establishing that visits with this incarcerated parent would have been inappropriate or infeasible. We conclude this combination of circumstances calls for a six-month extension to allow Katherine to work toward reunification. Accordingly, we reverse the termination order and remand for further proceedings.

**REVERSED AND REMANDED FOR FURTHER PROCEEEDINGS.**