**IN THE COURT OF APPEALS OF IOWA**

No. 17-1408
Filed December 20, 2017

**IN THE INTEREST OF R.O.,**
**Minor Child,**

**M.C., Mother,**
     Appellant,

**R.O., Father,**
     Appellant.

_____

Appeal from the Iowa District Court for Linn County, Barbara H. Liesveld, District Associate Judge.

The mother and father appeal separately the termination of their parental rights. **AFFIRMED ON BOTH APPEALS.**

Annette F. Martin, Cedar Rapids, for appellant mother.

Craig Elliott, Anamosa, for appellant father.

Thomas J. Miller, Attorney General, and Kathryn K. Lang, Assistant Attorney General, for appellee State.

Ryan P. Tang of Law Office of Ryan P. Tang, P.C., Marion, guardian ad litem for minor child.

Considered by Vaitheswaran, P.J., and Potterfield and McDonald, JJ.

**POTTERFIELD, Judge.**

The mother and biological father of R.O. appeal the termination of their parental rights to the child.[1] The mother maintains she should have been given additional time to work toward reunification. The father maintains the State failed to make reasonable efforts to reunify R.O. and claims this failure precludes the termination of his parental rights.

**I. Standard of Review.**

"We review termination of parental rights de novo." *In re T.S.*, 868 N.W.2d 425, 431 (Iowa Ct. App. 2015). "We will uphold an order terminating parental rights where there is clear and convincing evidence of the statutory grounds for termination." *Id.* Evidence is clear and convincing when there is no serious or substantial doubt as to the correctness of the conclusions of law drawn from the evidence." *Id.*

**II. Mother's Appeal.**

    **A. Background Facts and Proceedings.**

At the time R.O. was born, in the spring of 2013, the Iowa Department of Human Services (DHS) was already involved with the mother and her other children[2] due to the mother's ongoing issues with methamphetamine and her mental health. R.O. was born with marijuana in his system, and he was removed from the mother's care within a few days of his birth. He remained out of the

---

[1] The parental rights of R.O.'s legal father were also terminated. He does not appeal.
[2] The mother has three other minor children who were adjudicated children in need of assistance (CINA). Two of the mother's children were in the care of their father and her third child resided with a family friend. The mother's rights to her other children were not terminated.

mother's care until September 2013. Even after his return, the CINA proceedings continued until they were ultimately closed in October 2014.

The present case began in September 2015, after the mother was arrested for possession of methamphetamine. R.O. remained in the mother's care until November, when she went to jail. The removal was short-lived, and R.O. was returned to the mother's care when she was released—after approximately one week.

R.O. was removed from the mother's care for a third time—the second during these proceedings—in January 2016. The mother had been arrested again and was unavailable to parent R.O. Additionally, she had other pending criminal matters to deal with.

DHS attempted a trial home placement with R.O. and the mother in March 2016, but the mother relapsed on methamphetamine within a few days. The mother also had a relapse in November 2016 and February 2017.

At the time of the termination hearing in May 2017, the mother was forty years old and had a twenty-two-year history of using methamphetamine. According to her testimony, her longest period of sobriety during that twenty-two years was two or two-and-a-half years.

The hearing took place over two days—May 15 and 19. The mother was released from jail between the first and second days of hearing; she had been incarcerated in March 2017 following a probation violation. She remained on probation.

The mother testified that she had a "breakthrough" in February 2017 and was now addressing issues that she had never addressed before, such as

underlying trauma and how it had affected her decisions. She was also able to verbalize how her drug abuse affected her children. She testified she believed that her sobriety would last this time. The mother's therapist testified she had seen a change in the mother since February and agreed the mother was more committed to sobriety than she had been earlier in their relationship.

At the hearing, the mother agreed she needed to "continue to address [her] mental health and [her] sobriety issues" to have R.O. returned to her care. The mother was asked, "How long—how much time do you reasonably think it would be before [R.O.] could safely be returned to your care before we saw that, before the department saw that this is a real thing?" She responded, "I'm in agreement with what [the social worker] testified to as July is reasonable, the end of July."

The court terminated the mother's parental rights to R.O. pursuant to Iowa Code section 232.116(1)(f) (2017). The mother appeals.

**B. Legal Grounds.**

The mother argues she "should have been allowed more time to demonstrate that the therapy she finally received . . . has helped her understand her addiction and mental-health issues and that she now has the coping skills to maintain her sobriety and care for her children." The court may order an additional six-month period to work toward reunification only if the court makes "the determination that the need for removal of the child from the child's home will no longer exist at the end of the additional six-month period." Iowa Code § 232.104(2)(b).

While the mother maintains this time is different, she has been dealing with her addiction to methamphetamine for over half of her life. She has maintained

relatively short periods of sobriety before—at most, two-and-a-half years—but thus far has always returned to using the drug. Throughout these proceedings, the mother had at least three relapses. Although she had maintained sobriety for slightly more than three months at the time of the termination hearing, she was incarcerated during approximately two of those months. Additionally, the mother's most recent relapse occurred after the petition to terminate her parental rights had been filed. We hope the mother really has turned the corner in her battle with her addiction, but we "look skeptically at 'last-minute' attempts to address longstanding issues, finding them inadequate to preclude termination of parental rights." *In re A.D.*, No. 15-1508, 2016 WL 902953, at *2 (Iowa Ct. App. Mar. 9, 2016). Based on the mother's long-term history of drug addiction, we cannot say the need for R.O.'s removal would no longer exist if she was given additional time to work toward reunification.

The child has been removed from the mother's care a number of times since his birth. He has stayed with a number of foster families, forcing him to depend on a number of different individuals for his care and comfort. At the time of the termination hearing, R.O. had been living with his current foster family for approximately nine months, and the foster parents wanted to adopt R.O. They were committed to providing R.O. with security and stability and indicated their willingness to continue a relationship between R.O. and his siblings. This is in R.O.'s best interests. *See In re C.B.*, 611 N.W.2d 489, 495 (Iowa 2000) ("Insight for the determination of the child's long-range best interests can be gleaned from 'evidence of the parent's past performance for that performance may be indicative

of the quality of the future care that parent is capable of providing.'" (citation omitted)).

We affirm the termination of the mother's parental rights.

**II. Father's Appeal.**

**A. Background Facts and Proceedings.**

R.O.'s biological father was imprisoned in January 2015 and remained there until February 2016—a number of months into the pendency of the present action. The father requested visits with R.O. after his release from prison to a half-way house; those visits did not begin for approximately one month.

The father and R.O. visited regularly throughout the time he remained in the halfway house, but after his release in July 2016, the father began confirming and attending visits less frequently. According to the father's testimony, he relapsed on methamphetamine in July and September. As a result, his parole was revoked, and the father was sent back to prison in October.

In January 2017, after the court ordered the State to file the petition to terminate the father's parental rights, the father asked DHS to facilitate visits between him and R.O. at the prison. DHS denied the request, and a court hearing was held on the matter. The court denied the father's request for visitation in prison, stating:

> The court notes that the permanency goal in this case has never been reunification with the father. The parents are not married. There are no district court custodial orders between the parents and the current permanency goal pending is return home to mother. Although Anamosa Penitentiary has a family visitation area and protocols in place for visits to occur and the distance from Cedar Rapids to Anamosa is not onerous for a child [R.O.'s] age based upon the record, the court finds that substantial evidence exists to believe that reasonable visitation or supervised visitation between

[R.O.] and his father at the Anamosa Penitentiary would cause an imminent risk to the child's life or health herein.

The father participated in the termination hearing by way of phone, from prison. He testified that he anticipated discharging his sentence in March 2018.

Following the termination hearing, the court terminated the father's parental rights pursuant to Iowa Code section 232.116(1)(f). The father appeals.

**B. Legal Grounds.**

The father maintains the State failed to make reasonable efforts to reunify him with R.O. Specifically, he focuses on the month-long delay between his February 2016 prison release and the beginning of visits and the refusal to provide him in-prison visits after his January 2017 request.[3]

The State must make reasonable efforts to reunify a parent and a child, even when the parent is incarcerated. *See In re S.J.*, 620 N.W.2d 522, 524–25 (Iowa Ct. App. 2000). "The services required to be supplied an incarcerated parent, as with any other parent, are only those that are reasonable under the circumstances." *Id.* at 525. In determining what is reasonable, we consider:

> the age of the children, the bonding the children have or do not have with their parent, including any existing clinical or other recommendations concerning visitation, the nature of parenting deficiencies, the physical location of the child and the parent, the limitations of the place of confinement, the services available in the prison setting, the nature of the offense, and the length of the parent's sentence.

*Id.*

---

[3] The father had a court hearing on his request for in-prison visits, and the court denied his request in a March 2017 permanency review order. The father did not appeal from the permanency review order. However, we assume without deciding the father may challenge the issue of reasonable efforts here on appeal.

We first consider the time lapse between the father's request for visits with R.O. in February 2016 and the start of visits on March 21. The father testified that he met the social worker on February 18 and completed a social history. He testified he then contacted the family safety, risk, and permanency (FSRP) worker, who had to set up visitation and find a place for visits. The father also had to take steps to get it approved with his counselor at the halfway house. Based on all the steps that had to be taken, we cannot say the approximately one-month delay was a failure to make reasonable efforts. As the father testified, "Scheduling and everything takes time."

We also cannot say DHS's decision not to provide visits to the father while he was in prison was a failure to provide reasonable efforts. Here, the father did not request visits until after the termination petition had already been filed. The father had not taken advantage of his scheduled visits before his parole was revoked, and there did not appear to be much of a bond between R.O. and the father when he did attend visits. The FSRP worker testified visits between the father and R.O. were "mostly just fun and playing." The father had spent most of R.O.'s life in prison, and he was scheduled to remain in prison for approximately fourteen more months at the time of his request—well past the statutory requirement to determine permanency for R.O. Additionally, the father admitted he had not sent any letters or made any phone calls to R.O. since he was sent back to prison in October 2016.

Because the State established that it made reasonable efforts to reunify R.O. and the father, and because termination of the father's parental rights is in R.O.'s best interests, we affirm the termination of the father's parental rights.

**IV. Conclusion.**

Because there is clear and convincing evidence the statutory grounds for termination have been met and termination is in R.O.'s best interests, we affirm the termination of the mother's and the biological father's parental rights.

**AFFIRMED ON BOTH APPEALS.**